NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGELA BARKER, individually and on behalf of her minor children L.W. and N.W., <br><br> *Plaintiffs,* <br><br> v. <br><br> OUR LADY OF MOUNT CARMEL SCHOOL, et al., <br><br> *Defendants.* | Civil Action No. 12-4308 <br><br> OPINION |

THIS MATTER comes before the Court on Defendants Our Lady of Mount Carmel School ("OLMC"), Our Lady of Mount Carmel Church, Sylvia Cosentino, and the Roman Catholic Archdiocese of Newark's ("Archdiocese") (collectively "Defendants") motion for summary judgment against Plaintiffs Angela Barker, individually and as guardian for her children, L.W. and N.W. (collectively, "Plaintiffs"). Dkt. No. 106. This case arises out of Ms. Barker's attempts to obtain special education services for her children when they attended OLMC, a private school in New Jersey. Plaintiffs now asserts a number of federal disability and race discrimination claims, in addition to state law claims. For the reasons set forth herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

### I.   BACKGROUND

Ms. Barker is a practicing attorney who previously taught regular education and special needs students. Defs.' R.56 Stmt. ¶ 21.[1]  Her children, N.W. and L.W., both of whom are African American, were 10 and 5 years old respectively when they enrolled at OLMC.  Id. ¶ 26.

---

[1] Several times in Plaintiffs' responsive statement of material facts, they dispute Defendants' allegations but do not cite to any evidentiary support, add additional facts but do not contest the

OLMC is a k-8 private elementary school in Tenafly, New Jersey.  Id. ¶¶ 13-14.  The school is operated by the local parish, which also maintains Our Lady of Mount Carmel Church.  Id. ¶¶ 10-11.  The parish falls under the religious jurisdiction of the Roman Catholic Diocese of Newark. Id. ¶¶ 5-6.

### A.  Plaintiffs Enroll in OLMC and Receive Parent/Student Handbook

In 2010, Ms. Barker removed N.W. and L.W. from public school and enrolled them in OLMC.  Id. ¶ 29.  Prior to the start of the 2010 school year, Ms. Barker reviewed material related to the School and spoke with Sylvia Cosentino, the principal at the relevant time.  Id. ¶ 31.  Ms. Barker completed an application form that included a promise to pay the yearly tuition and signed an acknowledgement form ("Acknowledgement Form") where they agreed to comply with OLMC's policies and procedures regarding, among other things, student conduct, discipline, and discrimination.  Id. ¶¶ 35, 39.

OLMC's policies and procedures were set out in the Parent/Student Handbook, a copy of which was given to Plaintiffs before every school year ("Handbook").  Id. ¶ 36.  The Handbook's "Non-Discriminatory Admission Policy" prohibited the school for discriminating on a number of characteristics including race and disability.  Troublefield Decl. Ex. 13, 2010 Handbook at 2.  The Handbook also contained a "Code of Conduct," which established the rules for disciplinary action for students who engaged in disruptive behavior.  Defs.' Stmt. ¶ 40.  Students who received three disciplinary referrals would be required to meet with OLMC's disciplinary committee, known as the SHINE Committee.  Id.  Then, a series of meetings would be required between the student, parents, and the SHINE Committee, with escalating punishments if the violations continued.  Id.

---

asserted proposition, or assert arguments and legal analysis, not facts.  See, e.g., Pls.' R.56 Stmt. ¶¶ 4, 36, 37, 42, 56, 76, 83, 110.  Those are not valid disputes of fact, so Defendants' allegations are deemed undisputed where that occurs.  See L.Civ.R. 56.1(a).

The Committee was permitted to ask a student to leave OLMC if the student's disciplinary issues continued after he or she received five disciplinary referrals.  Id.  Despite these procedures, however, the Handbook and the Acknowledgment Form explained that OLMC retained the discretion to take disciplinary action other than those specified in the Handbook.  Id. ¶¶ 36, 39.

### B.  The 2010-11 School Year

In the fall of 2010, when L.W. was in kindergarten, Ms. Barker grew concerned with L.W.'s organization and attention skills.  Carter Decl. Ex. 40, Barker Dep. Tr. 37:22-38:6.  In December, she requested that the local Board of Education conduct a Child Study Team ("CST") evaluation of him, but was informed by a member of the Board's education services department that L.W. could not receive an evaluation through them because he was enrolled in private school.  Defs.' Stmt. ¶¶ 43-44, 46; Troublefield Decl. Ex. 9, Barker Dep. Tr. 74:13-77:4.  Ms. Barker then contacted Principal Cosentino, who explained that L.W. would have to be evaluated through OLMC's special services program.  Defs.' Stmt. ¶ 48; Troublefield Decl. Ex. 80.

Plaintiff then exchanged e-mails with Maureen Kerne, the Director of the Region V Council for Special Education ("Region V"), an entity that provides educational services to eligible students, including those at OLMC.  Defs.' Stmt. ¶ 50.  On December 28, 2010, Kerne e-mailed Ms. Barker regarding submission of Chapter 193 forms to Principal Cosentino and to Bergen County Special Services ("BCSS").  See Troublefield Decl. Ex. 19.  Chapter 193 services are remedial services funded by the State for handicapped students enrolled in nonpublic elementary and secondary schools—the services include evaluation and determination of eligibility for special education and supplementary instruction.  See N.J.S.A. 18A:46-19.1 et seq.  BCSS is under a contract with Tenafly to provide Chapters 193 services to OLMC.  R.56 Stmt. ¶ 53.

3

On January 23, 2011, the BCSS representative assigned to OLMC scheduled a CST meeting to review L.W.'s eligibility.  Id. ¶ 54.  Ms. Barker participated in the meeting, and signed a consent form that explained that procedural safeguards are available to protect students' rights regarding "the identification, evaluation, classification, the development of an [Individual Support Plan ("ISP")], and the provision of a Free Appropriate Public Education."  Id. ¶¶ 54, 56; Troublefield Decl. Ex. 25.

Following the meeting, on February 18, 2011, BCSS approved L.W. for an appointment for a psychiatric evaluation.  Id. ¶ 55; Reply R.56 Stmt. ¶ 55, Dkt. No. 127.  Ms. Barker also had L.W. privately evaluated by Dr. Aparna Mallik of the Child Development Center of St. Joseph Hospital.  Id. ¶ 58.  Both Dr. Mallik and BCSS's physician diagnosed L.W. with attention deficit hyperactivity disorder ("ADHD").  Id. ¶ 59; Troublefield Decl. Ex. 31, CST Evaluation Rpt. at 30.  Ms. Barker was again invited to attend an ISP Team meeting.  Defs.' Stmt. ¶ 57.

In April 2011, BCSS issued its CST evaluation report for L.W.  BCSS determined that L.W. was not eligible for special education related services.  See CST Evaluation Rpt. at 2.  The evaluation report also contained information about procedural safeguards, but Ms. Barker did not appeal the determination.  See id. at 3; Defs.' Stmt. ¶ 64.

Meanwhile, Ms. Barker contacted Principal Cosentino about N.W.  Carter Decl. Ex. 24, Dkt. No. 115.  She requested that N.W. also receive a CTS evaluation, but Principal Cosentino informed her that the deadline for Chapter 1983 evaluations for that year had passed and that the relevant forms would be available by May.  Id.

### C.  The 2011-12 School Year

In October and November 2011, L.W. received a disciplinary referral for rudeness and a second for striking another student.  See Troublefield Decl. Ex. 5, Cosentino Dep. 171:6-10; Id.

Ex. 68, Disciplinary Referrals at 1; Supp. Troublefield Decl. Ex 110.  Ms. Barker responded by e-mail to Principal Cosentino on November 29, 2011, in which she accused OLMC of attempting to "start a file on [L.W.]"  Troublefield Decl. Ex. 66.  The same day and the day after, L.W. misbehaved in class but was not given disciplinary referrals for the incidents.  Defs.' Stmt. ¶¶ 120-21.

Around the same time, Ms. Barker hired Sandra Beckford of the Department of Specialized Education Services for Teaneck Public Schools to observe L.W. and N.W. in the classroom and to make recommendations about their behavior, organizational, and social skills.  Id. ¶¶ 69-70; Reply Stmt. ¶ 70.  Beckford made recommendations to Ms. Barker and OLMC about accommodations, adjustments and/or modifications ("AAMs") to the students' educations, which OLMC put in place.  Id. ¶ 75.  The AAMs included, for example, arranging for Ms. Barker to purchase a second set of text books so N.W. would not have to carry them home, offering extra instruction and parent meetings with N.W.'s math and Spanish teachers, and setting up a chart on L.W.'s desk to remind him about behavior.  Id. ¶¶ 71, 103, 104, 108.  In providing the AAMs, Principal Cosentino and several of the children's teachers were in contact with Ms. Barker and Beckford via email concerning grades, classwork, performance, and behavior.  Id. ¶ 83.

Some of N.W.'s teachers spoke to Ms. Barker about his academic issues.  N.W's math teacher e-mailed Ms. Barker, stating that N.W. was struggling with his work, that she offered to see him during lunch, and explained the criteria for N.W. to receive full credit for his homework.  Id. ¶ 104.  N.W.'s Spanish teacher, Nancy Varettoni, told Ms. Barker that N.W. received a D on a previous exam and was have difficulty with certain aspects of the lesson plan, and she recommended that N.W. change to a course that permitted her to grade based on effort.  Id. ¶ 112.

In January 2012, Ms. Barker sent a letter to OLMC formally requesting an educational accommodation plan pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et seq., for both children.  Id. ¶ 76.

On February 3, 2012, Ms. Barker also asked Kerne and Region V to provide an occupational therapy evaluation for L.W. and a CST evaluation for N.W.  Id. ¶ 85. According to Kerne's deposition testimony, however, BCSS handled those types of evaluations, not Region V. See id. ¶¶ 85; Reply Stmt. ¶ 85.  The next day, Ms. Barker again wrote to Kerne and demanded that L.W. and N.W. receive the evaluations from Region V, stating, "[t]his is my last and final request without resorting to the legal process. Should the evaluations not be done within the time frame allowed by the law, I will refer this matter to my attorney . . ."  Defs.' Stmt. ¶ 86.

Three days letter, Elliot Guerra, the Dean of Discipline at OLMC sent an e-mail to Principal Cosentino and another individual that purportedly discussed Ms. Barker and her children.  See Carter Decl. Ex. 25, Guerra E-mail.  The message read:

> Mike and (Sylvia),
>
> I'll wait till we meet to discuss but the way we follow this is by the book – we don't go for the easy shot and that's it.  She'll question us and how were qualified and that's something we don't need to get into – most important Sylvia does not get involved- we document everything if she storms in without an appointment we don't take it, when we do we have someone taking minutes.  When she sues us we tell her to get the names write on the subpeana [sic].  The truth will set us free. Right now she's mad at Cresskill performing arts and we have one more slip – three more and he'll have to leave.  I'll be in tomorrow Morning – have an 830 appointment but will after to meet up and clear with sylvia.
>
> Defend Carmel,
>
> Elliot

Id. (errors retained).  Guerra later testified that he was "instruct[ed] to collect all documentation concerning" Plaintiffs, though he did not recall who gave the instruction.  See Carter Decl. Ex. 47, Guerra Dep. Tr. 67:21-69:19.

Meanwhile, on February 8, 2012, Beckford filled out the required Section 504 referral forms and submitted them to OLMC.  Id. ¶ 77.  Kerne sent an e-mail to Principal Cosentino the same day instructing her to "move ahead" with the Section 504 process for N.W.  See Carter Decl. Ex. 26; Troublefield Decl. Ex. 36.  Kerne also informed Principal Cosentino that Region V conferred with the Board Attorney, who explained that "[n]onpublic schools are required to write and implement 504 plans because they accept Federal assistance ([Individuals with Disabilities Education Act] nonpublic)."  Carter Decl. Ex. 27.

On February 17, 2012, Ms. Barker e-mailed Kerne again, threatening "to sue everyone - in Tenafly, Region V and anywhere else who is responsible for this nonsense."  Troublefield Decl. Ex. 38.

Principal Cosentino did not formally implement a Section 504 plan.  Instead, on February 28, 2012, Principal Cosentino e-mailed the following to two associate superintendents of the Archdiocese's administrative offices:

> My problem will not go away, and after speaking with the attorney for [Region V], I have set up a date to write a 504 for one of my students.  I do have medical documentation regarding his disability (which is almost a year old). After speaking with [Kerne] she said that we are already doing modifications and all we need to do is document them in writing . . . She also pointed out that other schools in the deanery have written 504's and if the parent got a hold on this info, it would not fare well for OLMC.  As you can see I'm between a rock and a hard place.

Carter Decl. Ex. 28.

On February 29, 2012, L.W. received his third disciplinary referral for looking into the girl's bathroom.  Defs.' Stmt. ¶ 121; Disciplinary Referrals at 2.

On March 7, 2012, Region V set up an Occupational Therapy assessment for L.W.  Defs.' Stmt. ¶ 89; Troublefield Decl. Ex. 39.  Kerne testified that, although Region V typically would not perform the assessment, it did so to satisfy Ms. Barker's requests and without the federal funds that are typically set aside for Chapter 193 processes.  Id. ¶ 88; Troublefield Decl. Ex. 21, Kerne Dep. Tr. 86:2-87:6.  But Ms. Barker was dissatisfied with the assessment, asserting in an E-mail to Kerne that it overlooked issues and did not include classroom observation of L.W.  Troublefield Decl. Ex. 41.  When Kerne did not respond, Ms. Barker sent a second e-mail stating, "You have yet to get back to me regarding this OT report.  If you don't respond I will take my concerns to Steve Pasternak and then to Trenton."  Id.  Ms. Barker then arranged for another evaluation of L.W. by Dr. Mallik, requested that Kerne perform a second evaluation of L.W. as well, and requested occupational and physical therapy evaluations for N.W.  Defs.' Stmt. ¶¶ 92-93.

The next day, L.W. received his fourth disciplinary referral for jumping on another student. See Disciplinary Referrals at 3.

Roughly a week after later, Principal Cosentino e-mailed Ms. Barker to schedule a "Reasonable Modifications" meeting for L.W., but stated "[a]s per a directive from the Archdiocese of Newark, Catholic Schools are not permitted to develop or implement 504 plans. Writing a plan for 'Reasonable Modifications' is the same thing just a different name for non-public schools."  Troublefield Decl. Ex. 36.

L.W. received a disciplinary referral on April 19th and two more on April 24th. Troublefield Decl. Ex. 68, Disciplinary Referrals at 4-6.  OLMC contacted Plaintiff via email to schedule a SHINE meeting with L.W. and to inform Ms. Barker that a parent meeting will be

required if L.W. receives one more.  Defs.' Stmt. ¶ 125.  L.W. apparently never attended the

meeting.  See Troublefield Decl. Ex. 74.  Later that day on April 24th, L.W.'s father, Willie Wright,

responded by e-mail directing the school to stop sending copies of referral slips home with L.W.

(as was the policy per the Code of Conduct) and to contact him and Ms. Barker directly instead.

See Troublefield Decl. Ex. 71; Defs.' Stmt. ¶ 119.  He stated that the disciplinary slips issued to

L.W. were considered "harassment, intentional infliction of emotional distress, defamatory,

discriminatory and retaliatory."  Troublefield Decl. Ex. 71.  He further stated that "[t]he next

disciplinary slip sent home with L.W. or any other retaliatory action against him will result in a

law suit for a restraining order filed against you, the school and the Archdiocese."  Id.

On April 26, 2012, Principal Cosentino wrote to Ms. Barker and her husband, advising

them that L.W. and N.W. would not be enrolled at OLMC for the upcoming school year.  The

letter explained:

> I am returning your $300 Parent's Guild fee for the 2012-2013
> school year.
>
> OLMC is a caring community. However, your threat of litigation for
> my enforcing student discipline (which applies to all students)
> makes it clear that the feeling is not mutual.
>
> Under the circumstances, I believe it to be in our mutual interest that
> [L.W.] and [N.W.] not be enrolled at Our Lady of Mount Carmel for
> the upcoming school year.
>
> As an aside, our Handbook is to be followed by every student in the
> school as well as the procedures set for anyone who breaks the rules.
> There are 264 students in this school, and I must maintain a safe
> environment for each and every child. As stated on page 6 of the
> Handbook: "It is important to note that all the Rules &
> Regulations/Policies & Procedures have been implemented to
> ensure the optimal academic and safety components of each child's
> educational experience." This is a requirement that I take seriously.

Supp. Troublefield Decl. Ex. 99, Dkt. No. 127-2.

9

On May 8, 2012, L.W. received another disciplinary slip for taking another student's behavior cards.  Disciplinary Referrals at 7.  A member of the SHINE committee contacted Ms. Barker to arrange a meeting.  Troublefield Decl. Ex.73.  Ms. Barker attended the meeting and submitted a letter, in which she alleged that OLMC failed to provide L.W. with educational services and took concerted steps to cite L.W. for behavioral issues despite his disability.  See Troublefield Decl. Ex. 75.

### D.  Final Communication and Evaluations

Ms. Barker sent a final letter to Ms. Cosentino on May 20, 2012, against raising issues about the school's treatment of L.W. based on his educational issues.  See Compl. Ex. 10, Dkt. No. 34-10.  Ms. Barker asserted for the first time that the discrimination was also on the basis of race.  See id.

L.W. received a second occupational therapy evaluation on June 4, 2012.  Id. ¶ 96.  BCSS continued evaluating L.W. and N.W. through July 2012 and found them both eligible for special needs.  Id. ¶¶ 97-98.  Upon reenrollment in public school, both L.W. and N.W. received Individualized Educational Plans from the local Board of Education.  See Barker Dep. Tr. 55:17-57:2.

## II.  PROCEDURAL HISTORY

Plaintiffs filed the instant action in July 2012.  See Compl., Dkt. No. 1.  They filed an Amended Complaint in February 2014 that asserted twenty-two causes of action.  Dkt. No. 34.  Plaintiffs allege violations of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; the Civil Rights Act of 1866 pursuant to 42 U.S.C. § 1981; violations of the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983; Title VI of the Civil Rights Act, 42 U.S.C. § 2000d; New Jersey's Law Against

Discrimination, N.J.S.A. § 10:5-1 et seq.; New Jersey's Education Laws, N.J.S.A. § 18A:35-1 et seq.; breach of contract; intentional and negligent infliction of emotional distress; and negligent supervision.

## III.   LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences must be construed in the light most favorable to the non-moving party.  Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## IV.   ANALYSIS

### A.     Section 504, ADA, and § 1983 (Counts 11, 13-19)

Defendants move for summary judgment first on Counts 11 and 13 through 19.  These Counts allege that Defendants violated Plaintiff's rights under Section 504 of the Rehabilitation Act (Counts Thirteen to Sixteen), the ADA (Counts Seventeen and Eighteen), and § 1983 (Counts Eleven and Nineteen).  Defendants argue that the claims are procedurally barred because Plaintiffs failed to exhaust their administrative remedies under the IDEA, a federal statute allowing parents of disabled children to challenge deficiencies in their child's free and appropriate public education ("FAPE") through an administrative process.  See 20 U.S.C. § 1415(a).  Plaintiffs do not assert a

claim under the IDEA; but, Defendants argue, the IDEA's exhaustion requirement apply here because Plaintiffs seek relief that is also available under the IDEA.  The Court agrees.

### 1.   *IDEA Exhaustion Requirements*

The IDEA requires, in relevant part, that states receiving federal funds "make available a FAPE to children with disabilities" and "implement specified procedural safeguards to ensure children with disabilities and their parents" receive due process.  Batchelor v. Rose Tree Media School Dist., 759 F.3d 266, 272 (3d Cir. 2014).  "These safeguards, known collectively as the IDEA's administrative process, provide parents with an avenue to file a complaint and to participate in an impartial due process hearing with respect to 'any matter relating to the identification, evaluation, or educational placement of the[ir] child, or the provision of [FAPE] to such child . . . .'"  Id. (original emphasis) (citing 20 U.S.C. §§ 1415(b)(6)(A), (f)(1)(A)).  Parties may only commence a civil action in District Court following the completion of an administrative hearing.  See 20 U.S.C. § 1415(i)(2)(C)(i)-(iii).  A plaintiff's failure to exhaust administrative remedies under the IDEA deprives federal courts of subject matter jurisdiction.  M.S. v. Marple Newtown Sch. Dist., 635 F. App'x 69, 71 (3d Cir. 2015) (citing Batchelor, 759 F.3d at 272).[2]

In certain circumstances, these requirements also apply to non-IDEA claims.  Section 1415(I) of the IDEA requires plaintiffs to exhaust the IDEA's administrative process not only in actions directly under the statute, but also "in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA."[3]  Batchelor, 759 F.3d at 272.  "This provision bars plaintiffs

---

[2] Plaintiffs concede that they did not pursue an administrative hearing.

[3] Section 1415(I) provides a "[r]ule of construction," which states:

> [n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the

from circumventing [the] IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute—e.g., section 1983, section 504 of the Rehabilitation Act, or the ADA." Id. (quoting Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 281 (3d Cir. 1996)).  A non-IDEA claim is subject to the IDEA's exhaustion requirement if it "relates[s] to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." Id. at 274; M.S. v. Marple Newtown Sch. Dist., 635 F. App'x 69, 71 (3d Cir. 2015).

Exhaustion is not required in very limited circumstances, such as where exhaustion is futile or inadequate, where the question presented is purely legal, where the administrative process cannot grant relief, or where exhaustion would work a severe or irreparable harm upon a litigant. D.M. v. New Jersey Dep't of Educ., 801 F.3d 205, 212 (3d Cir. 2015) (citing Komninos, 13 F.3d at 778-79).

### 2.  *Applicability of IDEA Exhaustion Requirements to Plaintiffs' Claims*

The eight counts challenged by Defendants break down into three groups; those alleging disability discrimination (Counts 13, 16, and 17), due process violations (Count 19), and retaliation on the basis of disability (Counts 11, 14, 15, and 18).  Based on the nature of these allegations, all three were subject to the IDEA exhaustion requirement.

Plaintiffs' disability discrimination and due process violations required exhaustion. Plaintiffs allege that N.W. and L.W. suffer primarily from ADHD, a covered health impairment under the IDEA.  See J.Q. v. Washington Twp. Sch. Dist., 92 F. Supp. 3d 241, 246 (D.N.J. 2015)

---

rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the [IDEA administrative process] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

(citing 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8(c)(9)(i)).  Plaintiffs allege that, despite this disability, Defendants refused to convene a 504 meeting or implement Ms. Barker's requested accommodations, and expelled N.W. and L.W., all of which "ha[d] the effect of denying [Plaintiffs] an appropriate education."  See Am. Compl. ¶¶ 289, 312, 329.  The due process claim similarly alleges that Defendants "den[ied] the Plaintiffs educational services to which they are entitled to without Due Process of Law."  Id. ¶ 345.  These claims all concern whether Defendants acted appropriately in response to Plaintiffs' assertions of disabilities and requests for accommodations.  That is, "[b]oth the genesis and manifestations of these problems are educational."  Batchelor, 759 F.3d at 278.  As such, Plaintiffs here aim to accomplish what the plain language of the IDEA expressly prohibits—the circumvention of the IDEA's exhaustion requirements by "repacking claims that could have been brought under the IDEA . . . as claims under some other statute."  Batchelor, 759 F.3d at 272.

Plaintiffs' retaliation claims also required exhaustion.  Their claims are similar to those in Batchelor, the leading case in this Circuit regarding exhaustion of retaliation claims.  See also S.D. v. Haddon Heights Bd. of Educ., No. 15-1804, --- F.3d ----, 2016 WL 4394536, at *6 (3d Cir. Aug. 18, 2016).  There, the plaintiffs, a mother and son, filed suit against the school district, primarily alleging that the school district retaliated against them "'for their advocacy with respect to [the son's] legally protected right'" to a FAPE.  Batchelor, 759 F.3d at 270, 274 (citation omitted).  The plaintiffs asserted retaliation and failure to provide a FAPE under the IDEA, retaliation in violation of Section 504, and retaliation in violation of the ADA.  Id. at 270.  The plaintiffs argued, as here, that they need not exhaust administrative remedies with regard to their § 504 and ADA claims.  Id.  The court disagreed, finding that the claims "palpably relate" to the provisions of a FAPE because

they concerned the plaintiffs' efforts to enforce their educational rights. Id. 274-74 (quotation marks omitted).

The same result holds here. Plaintiffs allege that Defendants retaliated against them because "Ms. Barker sought to petition the government for reasonable accommodations and services within OLMC for the children's disabilities," Am. Compl. ¶ 253, and allege that such conduct violates the Rehabilitation Act, the ADA, and the First Amendment.[4] See id. ¶¶ 253, 294, 340. Because there is a "logical path to be drawn" from the alleged retaliation to Defendants' alleged failure to provide and Plaintiffs' efforts to obtain a FAPE, the IDEA required exhaustion. See Batchelor, 759 F.3d at 274-75.

Plaintiffs raise several counterarguments but none have merit. First, they argue generally that the IDEA's exhaustion requirements do not apply to § 504, the ADA, civil rights claims, or NJLAD. That is incorrect. As explained above, the requirements clearly can and often do apply to those claims. See 20 U.S.C. § 1415(I); J.Q. v. Washington Twp. Sch. Dist., 92 F. Supp. 3d 241, 244, 252 (D.N.J. 2015) (dismissing NJLAD claim for failure to exhaust under IDEA). Plaintiffs rely on two cases that do not support their argument. See M.G. v. Crisfield, 547 F. Supp. 2d 399 (D.N.J. 2008); Davie v. Barnegat Bd. of Educ., No. 09-5769, 2010 WL 1186273 (D.N.J. Mar. 24, 2010). In both cases, the court found that the plaintiffs' § 504 and § 1983 claims did not require exhaustion under the IDEA because of the nature of the underlying allegations, not because the IDEA's requirements could never apply to those claims.[5]

---

[4] However, as explained below, the portion of Plaintiffs' First Amendment claim (Count 11) that asserts retaliation on the basis of race fails for other reasons.

[5] Those cases are also factually distinguishable. In M.G., plaintiff asserted a § 1983 due process claim that he was suspended without receiving a disciplinary hearing and asserted a § 504 claim that he was discriminated against because he was incorrectly regarded as disabled. 547 F. Supp. 2d at 415-16. The claims did not implicate the IDEA, the court held, because they are "claim[s that] could be brought by any general educational student" and do not "involve classification

Second, Plaintiffs argue that the New Jersey Department of Education ("NJ DOE") does not allow parents to raise non-IDEA claims through its administrative process. This is essentially a futility argument. It is also wrong. The NJ DOE's Special Education Rules, N.J.A.C. 6A:14 et seq., expressly contemplate the ability to raise non-IDEA claims. The Rules grant nonpublic school students with disabilities the right to request due process hearings to address "location, identification, evaluation, determination of eligibility, and reevaluation of students with disabilities enrolled in nonpublic schools," and affords them "those procedural safeguards . . . as specified by Federal law and rules under Part B of the IDEA . . . ." N.J.C.A. 6A:14-6.2(g). Part B of the IDEA reiterates the same rule of construction as § 1415(I). 34 C.F.R. § 300.516(e). Thus, the NJ DOE's Rules contain the same exhaustion requirements as the IDEA. Furthermore, Plaintiffs' argument is contrary to the litany of cases in this District where a New Jersey plaintiff's non-IDEA claims were dismissed for failure to raise them in an IDEA due process hearing. See, e.g., Woodruff v. Hamilton Twp. Pub. Sch., 305 F. App'x 833, 837 (3d Cir. 2009) (affirming dismissal of IDEA, ADA, and § 504 claims for failure to assert them in a due process hearing); E.K., 2015 WL 1421616, at *6.

---

and/or receipt of special services." Id. at 416-17 (original emphasis). Here, however, Plaintiff's claims do concern Plaintiffs' request for disability classification and therefore could not be brought by any general educational student.

Likewise, in Davie, the court did not require exhaustion of plaintiff's § 504 and NJLAD claims for compensatory and punitive damages because such damages are not available under the IDEA. 2010 WL 1186273, at *6. But here, in addition to damages, Plaintiffs seek relief available under the statute—implementation of an educational program that does not discriminate on the basis of disability. The Court also notes that that law has changed since Davie. In Batchelor, The Third Circuit Court of Appeals clarified that claims for compensatory damages are not categorically exempt from exhaustion. See E.K. v. River Dell Reg'l Sch. Dist. Bd. of Educ., No. 11-00687, 2015 WL 1421616, at *5 (D.N.J. Mar. 26, 2015) (citing Batchelor, 759 F.3d 273-74 and explaining change in law).

16

Plaintiffs' position is grounded in a misreading of the NJ DOE's Rules.  Plaintiffs contend that the NJ DOE does not review investigative complaints regarding violations of the Rehabilitation Act.  See NJ DOE, PARENTAL RIGHTS IN SPECIAL EDUCATION ("PRISE") 25 (2015), available at http://www.state.nj.us/education/specialed/form/prise/prise.pdf.  From that, Plaintiffs infer that there was no administrative process available to them.  But there is.  Plaintiffs could still have requested a due process hearing, which is a different procedural remedy from an investigative complaint.  Compare N.J.C.A. 6A:14-2.7(a) (explaining due process hearings) with N.J.C.A. 6A:14-9.2(a) (explaining investigative complaints); see also N.J.C.A. 6A:14-9.2(k) ("Nothing in [the Rules governing complaints] shall be construed as limiting the right of parents or adult students to seek a due process hearing with regard to issues raised in a request for complaint investigation.").

Finally, Plaintiffs argue that the IDEA's exhaustion requirements are not mandatory for nonpublic school students, and therefore "Plaintiff had the option to choose between mediation [or a due process hearing] and filing suit in state or district court."  Opp'n Br. at 11, Dkt. No. 114-2. Plaintiffs do not cite to any provision of the IDEA or any case law that states so.[6]  They instead rely again on a NJ DOE handbook, which states that parents of nonpublic students "may request mediation of a due process hearing if the child study team decides an evaluation is not warranted or if you disagree with the assessment plan."  NJ DOE, PRISE at 15.  Assuming Plaintiffs' reading of the handbook is correct, it does not make exhaustion optional.  It is the relevant statutes and rules that establish exhaustion requirements, not a handbook.  The NJ DOE rules apply the IDEA's procedures to eligible nonpublic students, N.J.C.A. 6A:14-6.2(g), and the IDEA's procedures must

---

[6] Plaintiffs cite Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 593 (3d Cir. 2000), but that case discussed permissive language in the Education of the Handicapped Act's fee shifting statute. It did not discuss the IDEA's exhaustion requirement.

be exhausted unless an exception applies, <u>Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.</u>, 95 F.3d 272, 281 (3d Cir. 1996).  Therefore, exhaustion was not optional for Plaintiffs.

Plaintiffs do not argue that any other exceptions to the IDEA's exhaustion requirements apply here.[7]  The Court accordingly holds that Plaintiffs failed to comply with the IDEA's exhaustion requirements before raising their Rehabilitation Act, ADA, and § 1983 claims.

### 3. *Statute of Limitations*

Defendants next argue that the IDEA's statute of limitations bars Plaintiffs from now seeking a due process hearing.  Plaintiffs did not respond to the issue in their briefing.  The Court agrees with Defendants.

The IDEA statute of limitations requires a parent to request a due process hearing within two years of "the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint."  <u>D.K. v. Abington Sch. Dist.</u>, 696 F.3d 233, 244 (3d Cir. 2012); 20 U.S.C. § 1415(f)(3)(D); <u>see also</u> N.J.A.C. 6A:14-2.7(a)(i) (adopting same limitations standard). "The same two-year statute of limitations for bringing administrative claims also applies to other legal claims premised on the IDEA, such as claims under § 504 of the RA, or claims invoking . . . FAPE duties."  <u>Blunt v. Lower Merion Sch. Dist.</u>, 767 F.3d 247, 269 (3d Cir. 2014); <u>see</u> <u>S.B. v. Trenton Bd. of Educ.</u>, No. 13-0949, 2014 WL 5089716, at *6 (D.N.J. Oct. 9, 2014) (applying

---

[7] Though Plaintiffs do not raise it in their brief, Ms. Barker testified in her deposition that the irreparable harm exception applied.  <u>See</u> Barker Dep. 139:19-141:14.  She stated that N.W. and L.W. would have to change schools, that they were allegedly discriminated against, and that Ms. Barker suffered from the experience.  But, in order to invoke the irreparable harm exception, "mere allegations by plaintiffs of irreversible harm will not be enough to excuse the completion of administrative proceedings . . . [P]laintiffs must provide affidavits from competent professionals along with other hard evidence that the child faces irreversible damage if the relief is not granted." <u>Komninos by Komninos v. Upper Saddle River Bd. of Educ.</u>, 13 F.3d 775, 779 (3d Cir. 1994).

IDEA statute of limitations to ADA claim).  The Court will therefore apply the IDEA's two-year limitations period to the claims that required exhaustion.

Based on that limitations period, the claims are time barred.  Plaintiffs' claims all stem from the years N.W. and L.W. were enrolled at OLMC, from 2010 to 2012.  At the latest, Plaintiffs were required to have an administrative hearing at some point two years after, in 2014.  They did not, and they do not now assert any exceptions to the timeline.  "Because Plaintiff[s are] out of time to exhaust [their] administrative remedies. . . [their] suit is barred from filing in federal court." See Purvis-Chapman v. Silverstein, No. 14-4252, 2016 WL 1261208, at *6 (D.N.J. Mar. 31, 2016). Summary judgment is entered in Defendants' favor on Counts 11 and 13 through 19.

**B. Section 1981 Violations (Counts 1, 2, 4, 5, and 7) and Title VI Violations (Counts 3 and 6)**

### 1. *Intentional Discrimination under § 1981 and Title VI (Counts 1, 3, and 4)*

Next, Plaintiffs bring claims of intentional discrimination pursuant to 42 U.S.C. § 1981 in Counts 1, 4, and 7, and claims of intentional discrimination pursuant to Title VI of the Civil Rights Act, 42 U.S.C. § 2000d in Count 3.  "Although the statutes guarantee different rights, the same analysis applies to both statutes."  Ke v. Drexel Univ., No. 11-6708, 2015 WL 5316492, at *11 (E.D. Pa. Sept. 4, 2015), aff'd, 2016 WL 1105404 (3d Cir. Mar. 22, 2016).

42 U.S.C. § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Under § 1981, a plaintiff must establish: (1) that she belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in Section 1981, including the right to make and enforce contracts. Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001).

Title VI of the Civil Rights Act provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Under Title VI, a plaintiff must show: (1) that there is racial or national origin discrimination; and (2) the entity engaging in discrimination is receiving federal financial assistance."  Ke, 2015 WL 5316492, at *12 (internal citations omitted).  "The standard for establishing an 'intent to discriminate on the basis of race' is identical in the Title VI and § 1981 contexts."  Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 569 (3d Cir. 2002).

Under § 1981, Plaintiffs allege that Defendants intentionally discriminated against them in performing certain contracts, though it is not entirely clear from the Amended Complaint which contracts they rely on.  See Am. Compl. ¶¶ 194, 212, 226.  Plaintiffs' Title VI claim also generally alleges intentional discrimination.  See id. ¶ 208.  As made clear from their briefing, the alleged discriminatory acts were the race-based denial of access to special education, issuance of disciplinary slips, and the expulsion.  See Opp'n Br. at 21.[8]

### i.  Circumstantial Evidence of Discrimination

Plaintiff argues that circumstantial evidence of race discrimination exists.  The Court disagrees.

Where a plaintiff seeks to prove race discrimination through circumstantial evidence, the McDonnell Douglas burden-shifting framework applies.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Anderson v. Wachovia Mortgage Corp., 621 F.3d 261, 268 (3d Cir. 2010). Under this framework, Plaintiffs must show by a preponderance of the evidence that (1) they are

---

[8] Plaintiffs explain the standard for direct evidence of discrimination in their briefing, but do not point to any such evidence in the record.  See Armbruster v. Unisys Corp., 32 F.3d 768, 778–79 (3d Cir. 1994) (describing direct evidence as the proverbial "smoking gun").

members of a protected class; (2) they were qualified to continue in pursuit of their education; (3) they suffered an adverse action; and (4) such action occurred under circumstances giving rise to an inference of discrimination.  See, e.g., Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir.2003).  Even if Plaintiffs met the first three prongs of the test, they did not present evidence that permits an inference of discrimination.

Plaintiffs first point to the denial of educational benefits as evidence of discrimination. Plaintiffs argue that Defendants offered other students Section 504 plans, but did not offer them to Plaintiffs, who are African-American.  Plaintiffs admit, however, that they do not know the race of the other students who received the plans.  See Opp'n Br. at 22.  They do not provide any other information about those students to establish that the students are similarly situated to L.W. and N.W.  Absent such evidence, the fact that unnamed students of unknown race and unknown academic ability received the plan does not establish an inference of disparate treatment.  See Sloan v. City of Pittsburgh, 110 F. App'x 207, 212 (3d Cir.2004) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir.1998)) ("Because [Plaintiff] failed to allege any evidence of a similarly situated employee treated differently, this claim must fail.").

Plaintiffs do point to evidence that Defendants relayed inconsistent information to Plaintiffs about applying for educational services and kept information about other students' receipt of Section 504 plans from Plaintiffs.  While evidence of procedural irregularities like these can raise an inference of discriminatory intent, Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir.1997), Plaintiffs cannot establish such an inference without putting forth some evidence that the irregularities were related to race, E.E.O.C. v. Muhlenberg Coll., 131 Fed. App'x 807, 812 (3d Cir. 2005).  They have not done so.

Plaintiffs next allege that the disciplinary actions were racially motivated.  Plaintiffs point to L.W.'s "campaign" of disciplinary referrals for spying on a female student and striking other students.

No inference of racial animus arises from these events.  While Plaintiffs contend that the disciplinary slips were issued as part of a "campaign" against L.W. and N.W., they do not show that the charges against L.W. were spurious or exaggerated.[9]  For example, Ms. Barker's only evidence that L.W. did not enter the bathroom is that it would be "strange . . . for a six-year old boy."  Defs.' Stmt. ¶ 141.  Ms. Barker also argues, without citation to any evidence in the record, that L.W. did not strike the other students because the other students could have been "playing around."  Pls.' R.56 Stmt. ¶ 73.  She does not show how the other students involved were similarly situated but treated differently, or provide any other reason to believe that the issuance of the slips shows discriminatory intent.  Id. ¶¶ 117-22.

Next, Plaintiffs argue that and Ms. Varettoni's statements about N.W.'s academic abilities in Spanish class suggest discrimination.  But this does not reveal an intent to discriminate, either.  In an e-mail exchange between Ms. Barker and Ms. Varettoni, Ms. Varettoni explained that N.W. had difficulty with a certain lesson, which was the first in a series of more challenging ones.  See Defs.' Stmt. ¶ 112.  Her recommendation that N.W. switch levels would allow her to give N.W. satisfactory grades "as long as he is working to the best of his ability . . . "  Id.  Nothing suggests that this decision was motivated by race.  As such, there is no direct evidence of discrimination.

---

[9] There is also evidence that Defendants solicited complaints from other parents about L.W. and N.W.'s behavior and were inclined to have L.W. and N.W. removed from OLMC.  But, as stated above, Plaintiffs have not put forth any evidence that these irregularities were somehow related to race.  See Muhlenberg Coll., 131 Fed. App'x at 812.

Plaintiffs' bare suspicions cannot fill in this evidentiary gap.  For example, Plaintiffs allege that these incidents associate L.W. and N.W. with "traits [that] have been traditionally used to characterize African-American boys/Men [sic] as overly aggressive sexualized, low intelligent, sub-humans." Pls.' R.56 Stmt ¶ 140.  Ms. Barker also testified that she "think[s] . . . they would not have [said L.W. was caught looking into the girl's bathroom] if he had been a white boy" and that she "believe[s] they would have given a white child those [Section 504] modifications."  .' R.56 Stmt. ¶ 140.  Ms. Barker also testified that she "observ[ed]" discrimination because L.W. and N.W. "got expelled from the school for things that another child who was white would not have gotten expelled for." Id.  To defeat a motion for summary judgment, however, "a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  A "subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief." Elliott v. Group Med. & Surgical Serv., 714 F.2d 556, 567 (5th Cir. 1983); See also  Yue Yu v. McGrath, 597 F. App'x 62, 67 (3d Cir. 2014) (citing Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1151 (10th Cir. 2008) (subjective belief in invidious nature of isolated and ambiguous comment does not support inference of discrimination)).

Finally, Plaintiffs argue that the expulsion was racially motivated.  They attempt to prove this by arguing that that African-American students were disproportionately subject to disciplinary at OLMC.  They allege that, from 2008 through 2013, eighteen of the thirty-two students referred to the SHINE Committee were African-American, totaling 56.25%, but that African-American students accounted for only 15% of OLMC's student population.  They argue, without any citation to expert testimony, that this creates an inference of discrimination.  This is also unavailing.

To recover under Title VI or § 1981, Plaintiffs cannot simply assert that Defendants' disciplinary policy has a disproportionate effect on certain minorities.[10] See Pryor, 288 F.3d at 562 (citing Stehney v. Perry, 101 F.3d 925, 937 (3d Cir. 1996) ("[A] facially neutral policy does not violate equal protection solely because of disproportionate effects.").   To prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker adopted the policy at issue "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pryor, 288 F.3d at 562 (internal citations omitted).   Evidence of disparate impact may serve as an "important starting point" for determining the existence of intentional discrimination, but it is not sufficient by itself. See Pryor, 288 F.3d at 563.   Here, Plaintiffs' only evidence is that the facially neutral SHINE committee procedures had a disproportionate impact on OLMC's African-American students.   They do not provide any analysis performed by a qualified expert explaining why the proffered statistics are liable and accurate.   They do not explain why the numbers are sufficiently stark and unexplainable on grounds other than race.   And they do not provide any evidence that the policy was adopted because of its effects on African-American students.   As such, they have not proved their claim.

Accordingly, Defendants' motion for summary judgement is granted as to Plaintiffs' claims of intentional discrimination under Title VI and § 1981.

---

[10] Plaintiffs only allege intentional discrimination, not disparate impact, under Title VI and § 1981. Nor could they.  A private right of action is not available to enforce disparate impact regulations promulgated under Title VI.  S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 274 F.3d 771, 777 (3d Cir. 2001) (citing Alexander v. Sandoval, 532 U.S. 275, 293 (2001)).  Similarly, "disparate impact claims are not actionable under section 1981." Pollard v. Wawa Food Mkt., 366 F. Supp. 2d 247, 252 (E.D. Pa. 2005).

### 2.  *Hostile Environment under § 1981 and Title VI (Counts 5 and 6)*

Under a hostile environment theory, a plaintiff may recover for alleged "severe, pervasive, and objectively offensive" harassment if the school "acts with deliberate indifference to known acts of harassment." Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 633 (1999).  But Plaintiffs must raise at least an inference of discrimination to move forward with their hostile environment claim.  Bridges ex rel. D.B. v. Scranton Sch. Dist., No. 14-4565, --- Fed.Appx. ----, 2016 WL 953003, at *6 (3d Cir. Mar. 14, 2016) (citing Blunt, 767 F.3d at 276 n.45).  Because, as discussed above, Plaintiffs have not to put forth evidence that could reasonably create an inference of discrimination, their hostile environment claims fail, as well.

### 3.  *Retaliation under § 1981 (Count 2)*

Plaintiffs' retaliation claim under § 1981 fails for similar reasons.  To establish a prima facie case for retaliation under § 1981, a plaintiff must show by a preponderance of the evidence (1) that he engaged in a protected activity; (2) that he suffered an adverse action; and (3) that there was a causal connection between the protected activity and the adverse action.  Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  The defendant can rebut the prima facie case by asserting a legitimate, nondiscriminatory reason for the adverse action. Quiroga v. Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991).  The burden then shifts back to the plaintiff to show by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext for discrimination.  See Waddell v. Small Tube Prod. Inc., 799 F.2d 69, 73 (3d Cir. 1986).

The theory underlying Plaintiffs' § 1981 retaliation claim is not entirely clear.  The entirety of Plaintiffs' briefing on the issue is as follows: "Defendants retaliated against Plaintiff, L.W. and N.W. on the basis of their race . . . by expelling them when Ms. Barker continued her pursuit for

her children's lawful right to access to special education services.  Defendants retaliated against L.W. by barraging him with trumped up disciplinary slips to hasten his expulsion in total disregard of the Handbook disciplinary procedures."  Opp'n Br. at 29.  It appears that Plaintiffs' retaliation claims are predicated on similar adverse events as their intentional discrimination claim—i.e., the alleged campaign of disciplinary slips and the expulsion—and the protected acts are Plaintiffs' complaint of race discrimination.

The Court must first identify the protected activity that relates to race discrimination.  Doe v. Sizewise Rentals, LLC, No. 09-3409, 2012 WL 1191944, at *5 (D.N.J. Apr. 10, 2012) ("In order to state a claim for retaliation under § 1981, the 'protected activity' must relate to discrimination prohibited by § 1981, not just under any statute."), aff'd, 530 F. App'x 171 (3d Cir. 2013).  Ms. Barker and her husband complained generally about "retaliation" on several occasions, but those complaints all revolved around educational disability issues and do not mention race.  See, e.g., Troublefield Cert. Ex. 66, e-mail dated November 29, 2011 (accusing Ms. Cosentino of creating file of disciplinary slips but not mentioning race); Compl. Ex. 5, e-mail dated April 24, 2012 (asserting that disciplinary slips were retaliatory but not mentioning race); Compl. Ex. 8, letter dated May 14, 2012 (discussing retaliation for requesting educational services); see also Ogunbayo v. Hertz Corp., 542 F. App'x 105, 107 (3d Cir. 2013) (finding no protected conduct where plaintiff's complaints did not discuss protected characteristic and noting that use of word "discrimination" alone was insufficient).  The only complaint related to race is the letter Ms. Barker sent to Ms. Cosentino on May 20, 2012.  Compl. Ex. 10, Letter dated May 20, 2012, Dkt. No. 34-10.  The May 20th Letter is therefore the only instance of protected activity under § 1981.

Plaintiffs must demonstrate a causal connection between the May 20th Letter and the disciplinary slips and expulsion.  They have not done so.  Both adverse acts predate that letter.

Defendants informed Plaintiffs about the expulsion nearly a month earlier, on April 26, 2012.  <u>See</u> Second Troublefield Decl. Ex. 99.  Every disciplinary slip that Defendants issued to L.W. and N.W. also occurred before then, with the final referral occurring on May 19, 2012.  <u>See</u> Disciplinary Referrals at 8.  Because these events occurred before the protected act, there can be no causal connection between them.  See <u>Alja-Iz v. U.S. Virgin Islands Dep't of Educ.</u>, 626 F. App'x 44, 47 (3d Cir. 2015) (citing <u>Glanzman v. Metro. Mgmt. Corp.</u>, 391 F.3d 506, 516 (3d Cir. 2004) (observing that it is not possible to meet the retaliation standard when the adverse action precedes the protected activity)).  Plaintiffs' § 1981 retaliation claim fails.[11]

### C.  First Amendment Retaliation Claim (Count 11)

Plaintiffs also bring First Amendment retaliation claims under § 1983.  Again, the theory behind their claim is unclear, but they generally allege retaliation for threatening to tell the state government about Defendants' conduct.  <u>See</u> Am. Compl. ¶¶ 253, 255.  Defendants argue that the claim fails because Plaintiffs have not demonstrated any state action.  The Court agrees.

"A plaintiff in a section 1983 action bears the threshold burden of proving that 'the alleged deprivation was committed by a person acting under color of state law.'"  <u>Robert S. v. Stetson Sch., Inc.</u>, 256 F.3d 159, 164 (3d Cir. 2001) (internal citations omitted).  Here, Defendants are all private institutions or individuals, "and thus the school and its employees do not formally wield the authority of the state."  <u>Id.</u>  But private behavior may be treated as that of the State itself in some circumstances.  <u>Id.</u> (citing <u>Brentwood Acad. v. Tennessee Secondary Sch.</u>, 531 U.S. 288, 295 (2001)).  The answer depends on whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State

---

[11] Count 7 asserts claims for deliberate indifference and failure to supervise and train.  These claims fail as a matter of law because Plaintiffs have not established any underlying violation.  <u>See</u> <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3d Cir. 2004).

itself." Leshko v. Servis, 423 F.3d 337, 339 (3d Cir.2005).  This inquiry looks at whether (1) "the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "the private party has acted with the help of or in concert with state officials"; or (3) "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."  Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009).  The inquiry is fact-specific, Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995), but "the state nexus requirement that triggers the application of the First Amendment is not readily met in the case of a private educational institution," State v. Schmid, 84 N.J. 535, 543 (1980).

Here, Plaintiffs have not met their threshold burden of establishing state action.  They do not specifically allege that Defendants fall under one of the three predicates.  Instead, they state generally that Defendants are state actors because Defendants receive federal funds, Plaintiffs were seeking Chapter 192 and 193 educational services, which are made available to nonpublic school students through the local public school district, and Defendants allegedly made misstatements about the availability of these services and impeded Plaintiffs' access to them.  See Opp'n Br. at 16.

None of these reasons prevail.  A private school does not become a state actor simply because it receives government funds.  Robert S., 256 F.3d at 165 ("[It] is clear that Stetson's receipt of government funds did not make it a state actor.").  Nor does it become a state actor because it is subject to state educational regulations, particularly since the regulations did not compel or influence the particular wrongful conduct at issue. See Rendell-Baker v. Kohn, 457 U.S. 830, 841 (1982); Kach, 589 F.3d at 649.  Finally, the fact that Defendants allegedly made

misstatements does not somehow render them state actors.  Plaintiffs have not sufficiently demonstrated state action, so their § 1983 claim fails.

### D.  NJLAD Claims (Counts 8, 9, and 12)

Plaintiffs asserts NJLAD claims for race discrimination (Count 8), bullying (Count 9), and retaliation (Count 12).[12]  Defendants argue that they are exempt from liability under the NJLAD's religious institution exemption.  See N.J.S.A. § 10:5-5(I).  Plaintiffs contend only that "[t]he trier of fact must conduct a fact-sensitive inquiry of the Defendants' position that is [sic] entitled to religious exemption."  Opp'n Br. at 28.

The NJLAD prohibits discrimination on various grounds, including race and disability, in any "place of public accommodation," a defined term that includes schools regardless of their source of funding.  L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ., 189 N.J. 381, 405 (2007) (citing N.J.S.A. § 10:5-5(I)); N.J.S.A. § 10:5-12(f).  The term does not "apply to any educational facility operated or maintained by a bona fide religious or sectarian institution." N.J.S.A. § 10:5-5(I).  "This exception applies both to elementary and high schools operated by religious institutions under the supervision of the State Board of Education and to purely religious schools which are not subject to any form of governmental regulation."  Wazeerud-Din v. Goodwill Home & Missions, Inc., 325 N.J. Super. 3, 15 (App. Div. 1999).

---

[12] In Count 8, Plaintiffs also cite to N.J.S.A. §§ 18A:35-1, 36-20, and 38-5.1.  These subsections fall under the New Jersey Education Laws, N.J.S.A. § 18A:1-1 et seq., not under the NJLAD, N.J.S.A. § 10:5-1, et seq.  Subsections 36-20 and 38-5.1 prohibit race discrimination in schools, so they fail for the same reasons as Plaintiffs' federal race discrimination claims.  Subsection 35-1 requires boards of education to offer a course in U.S. history that includes the history of African-Americans in the United States.  It does not appear to permit a cause of action against a school, whether public or private.  More importantly, Plaintiffs have not provided any evidence in support of this claim.  The three Education Law claims are dismissed.

The exception applies here.  OLMC, an elementary school, is an "educational facility." See id. at 13-15; Defs.' Stmt. ¶ 13.  It is maintained and operated by the Our Lady of Mount Carmel Parish, a non-profit religious corporation with a church and pastoral offices.  See Defs.' Stmt. ¶¶ 5, 10, 16.  Religious institutions like Our Lady of Mount Carmel Church and the Roman Catholic Archdiocese of Newark are similarly exempt.  Wazeerud-Din, 325 N.J. Super. at 10 ("Although churches, seminaries and religious programs are not expressly excluded from the definition of 'place of public accommodation,' the Legislature clearly did not intend to subject such facilities and activities to the LAD.").  Thus, the claims against these institutional Defendants fail as a matter of law.

Plaintiffs next argue that, even if the institutional Defendants are exempt, Ms. Cosentino can still be held individually liable because the exemptions only apply to institutions.  That is incorrect.  Plaintiffs contend that Ms. Cosentino can be liable under an aiding and abetting theory. See Opp'n Br. at 28-29.  Supervisors can be held individually liable under NJLAD for aiding and abetting their employers' discriminatory conduct.  See Failla v. City of Passaic, 146 F.3d 149, 155 (3d Cir. 1998) (citing N.J.S.A. § 10:5-12(e)).  But such liability cannot exist without an underlying NJLAD violation by the employer.  Id. at 155.  Here, because Ms. Cosentino's employers are exempt from NJLAD liability, Plaintiffs cannot hold her individually liable under the statute.

**E.  Breach of Contract (Count 10)**

Count 10 asserts that OLMC breached a contract with Ms. Barker by expelling N.W. and L.W.  Plaintiffs never specify the contract or provision that they rely on, but the argument seems to arise from the various enrollment agreements and the Parent/Student Handbook.

Defendants argue that they were contractually permitted to remove L.W. and N.W. from the school.  Specifically, they argue that Plaintiffs breached their obligations by failing to abide by

the Handbook and Code of Conduct's disciplinary requirements and procedures.  Plaintiffs respond

that expulsion was improper because Defendants wanted to expel L.W. and N.W. and expulsion

was not the proper punishment under the Handbook.

"To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish

three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant

to perform its obligations under the contract; and (3) a causal relationship between the breach and

the plaintiff's alleged damages."  Sheet Metal Workers Intern. Ass'n Local Union No. 27, AFL–

CIO v. E.P. Donnelly, Inc., 737 F.3d 879, 900 (3d Cir. 2013) (citing Coyle v. Englander's, 488

A.2d 1083, 1088 (N.J. Super. App. Div. 1985)).  A plaintiff must identify the specific contract or

provision that was allegedly breached.  See Skypala v. Mortgage Electronic Registration Systems,

Inc., 655 F. Supp. 2d 451, 459 (D.N.J. 2009) (dismissing breach of contract claim because

complaint did not identify provisions plaintiff asserted were breached).

Plaintiffs have not satisfied the first element.  To the extent that Plaintiffs allege that

Defendants breached some unspecified agreement, their claim fails.  They have not identified what

contract or contractual provision Defendants allegedly breached.  See Wingate Inns Intern., Inc. v.

Cypress Centre Hotels, LLC, No. 11-6287, 2012 WL 6625753, at *9 (D.N.J. Dec. 19, 2012)

(determining that the Court cannot draw a reasonable inference of liability for breach of contract

without identification of the specific agreement and related provision relied upon); Eprotec

Preservation, Inc. v. Engineered Materials, Inc., No. 10-5097, 2011 WL 867542, at *8 (D.N.J.

Mar. 9, 2011) ("Under New Jersey law, a complaint alleging breach of contract must, at a

minimum, identify the contracts and provisions breached"[;] "Failure to allege the specific

provisions of contracts breached is grounds for dismissal.").  This case illustrates why such a rule

exists.   As  part  of  their  enrollment,  Plaintiffs  completed  application  forms,  signed

acknowledgement forms, and received the Parent/Student Handbook, which contains several pages of obligations between the parties. Plaintiffs have had access to these documents and should be able to identify the specific contract and provision breached. They have not. The Court therefore cannot identify the operative provisions with any reasonable certainty.

Assuming the Court was able to, Plaintiffs also fail to establish breach of any relevant provisions. Plaintiffs first argue that "Defendants breached the established contract with Ms. Barker by terminating the contract for the sole reason that N.W. and L.W.'s father stated that he would petition the government to protect L.W. from OLMC's further acts of discriminatory and retaliatory conduct in violation of L.W.'s civil rights." Am. Compl. ¶ 248.[13] The issue, then, is whether Defendants' alleged retaliatory motive constitutes a breach of the agreements.

Generally, a party's motivation in terminating an agreement is irrelevant as long as the party has a legal right to terminate its obligation. See Karl's Sales & Serv., Inc. v. Gimbel Bros., 249 N.J. Super. 487, 494 (App. Div. 1991) ("The law is clear that where the right to terminate a contract is absolute under the wording in an agreement, the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective."); see also Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 319 (3d Cir. 2001) ("Karl's Sales . . . certainly state[s] the proper rule as regards private contractual relationships."). As such, even if OLMC had a nefarious motive, that motive does not amount to breach unless they violated a provision of the contract.

_____

[13] Plaintiffs do not say that their breach of contract claim is based on disability discrimination, nor could they. That theory would be an impermissible attempt to plead around the IDEA's exhaustion requirements. Plaintiffs do suggest in their brief that the breach is also based on race discrimination, see Opp'n Br. at 31 (citing 42 U.S.C. § 1981), but that theory fails due to the same lack of proof as the federal race discrimination claims.

The only potential contractual hook is the non-discrimination provision in the Parent/Student Handbook.  But that provision by its express terms only governs discrimination.  See Parent/Student Handbook at 4.  It does not offer any contractual protections against retaliation.  See Kutzin v. Pirnie, 591 A.2d 932, 936 (N.J. 1991) ("Where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and we must enforce those terms as written.").  Moreover, it is doubtful whether New Jersey law permits a contractual obligations based on provisions of student handbooks.  See, e.g. Romeo v. Seton Hall Univ., 875 A.2d 1043, 1050 (N.J. Super. App. Div. 2005) ("A contractual relationship cannot be based on isolated provisions in a student manual."); Mittra v. Univ. of Medicine & Dentistry of N.J., 719 A.2d 693, 698 (N.J. Super. App. Div. 1998) (rejecting use of a manual to determine the scope of the relationship).  Finally, Plaintiffs do not offer any textual or policy argument to the contrary.  As such, while Defendants retaliatory motive theory may well have merit under other contract theories, it does not have merit under a standard breach of contract claim between private parties.

Plaintiffs next argue that Defendants breached the agreement by expelling L.W. and N.W. without following the Code of Conduct's procedures.  But the Code of Conduct and acknowledgement form permit OLMC to take action other than those specified in this Handbook.  As such, assuming Plaintiffs are correct that Defendants did not strictly follow the Code of Conduct, Defendants were permitted to use their discretion in removing L.W. and N.W.  Therefore, no duty was breached.  See Defs.' Stmt. ¶¶ 36, 39; see also Gazarov ex rel. Gazarov v. Diocese of Erie, 80 F. App'x 202, 206 (3d Cir. 2003).  Accordingly, Plaintiffs' breach of contract claim fails.

### F.  Emotional Distress Claims (Counts 20 and 21).

Defendants next move for judgment on Plaintiffs intentional and negligent infliction of emotional distress claims.

To make out a prima facie case of intentional infliction of emotional distress ("IIED"), a plaintiff must show that (1) the defendant acted intentionally; (2) the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) the defendant's actions proximately caused him/her emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it.  Soliman v. Kushner Companies, Inc., 433 N.J. Super. 153, 177 (App. Div. 2013) (internal citations omitted).

Defendants argue that Plaintiffs have not provided proof of severe emotional distress.  The Court agrees.  "[W]hen the intentional conduct is directed at the plaintiff, he or she need not prove any physical injury.  It suffices that the conduct produce emotional distress that is severe."  Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 367 (1988) (internal citations omitted).  "[T]he genuineness and severity of emotional distress can present threshold questions of law."  Decker v. Princeton Packet, Inc., 116 N.J. 418, 430 (1989).  A claimed injury is not severe if it "is not sufficiently palpable, severe, or enduring . . . ."  Id. at 431; Eyrich for Eyrich v. Dam, 193 N.J. Super. 244, 253 (App. Div. 1984) ("[E]motional disturbance, to be compensable at all, must be sufficiently substantial to result in physical illness or serious psychological sequelae.").  "Negligent and intentional infliction claims require the same level of emotional distress, meaning if plaintiff's intentional infliction claim is insufficient, then her claim of negligent infliction is similarly precluded."  Lascurain v. City of Newark, 349 N.J. Super. 251, 282 (App. Div. 2002).

Here, Plaintiffs state that "[Ms. Barker] and the children sought counseling as well as 'suffer[ed] real and serious emotional damages' not at their own hands."  Opp'n Br. at 36 (citing Am. Compl. ¶¶ 356, 360).  Aside from the insufficient conclusory allegation of emotional damage, Plaintiffs' statement that they sought counseling an unspecified number of times does not amount

to palpable, severe, or enduring distress.  They also state that L.W. cried and exhibited other unspecified "signs of anxiety," Opp'n Br. 37, but do not provide any evidentiary support for the assertion.[14]  Even if taken as true, these generalized allegations are equally insufficient to survive summary judgment.  Because Plaintiffs have not met this threshold question, judgment on Counts 20 and 21 are entered in favor of Defendants.

Plaintiffs argue that they have a lower burden of proof because they "allege intentional infliction of emotional distress pursuant to violations under the NJLAD."  Opp'n Br. at 35.  In support, they cite to Rendine v. Pantzer, 141 N.J. 292 (1995).  Rendine discusses the level of evidentiary support required to prove emotional distress damages for an NJLAD claim.  See id. at 311-12.  Here, none of the NJLAD claims survived, so Rendine is inapplicable.

To rebut this, Plaintiffs argue that their IIED and NEID claims are in fact NJLAD claims, but that argument fails for two reasons.  First, the Amended Complaint does not assert these claims under NJLAD, see Am. Compl. ¶¶ 358-367, and Plaintiffs do not cite to any cases where emotional distress causes of action were asserted under NJLAD.  Second, to the extent the claims were asserted under NJLAD, Defendants would be exempt for the same reason as the other NJLAD claims.

### G.  Negligent Supervision (Count 22)

Finally, Plaintiffs claim that Defendants are liable for negligent supervision of Ms. Cosentino.  They allege that Defendants were negligent because Principal Cosentino "(1) had no knowledge of Section 504 plans; (2) held modification planning meetings without involving parents; and (3) informed Ms. Barker that she had missed the deadline to submit her request for

---

[14] Plaintiffs did not submit an expert report to corroborate their distress claims.

evaluation to Bergen County Special Services when there is no statutory deadline." Opp'n Br. at 30 (internal citations omitted).

Under New Jersey law, the tort of negligent hiring, supervision, and retention requires the satisfaction of two elements. First, the plaintiff must demonstrate that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons." Di Cosala v. Kay, 450 A.2d 508, 516 (N.J. 1982); Lingar v. Live–In Companions, Inc., 300 N.J. Super. 22, 692 A.2d 61, 65-65 (App. Div. 1997). Second, the plaintiff must show that as a result of the employer's negligent supervision, the employee's "incompetence, unfitness or dangerous characteristics," were the proximate cause of the plaintiff's injuries. Di Cosala, 450 A.2d at 516.

Defendants assert that the negligent supervision claim falls under NJLAD and is therefore legally barred. See Defs.' Br. at 32-37, Dkt. No. 107; Reply at 16-17, Dkt. No. 126. A negligent supervision cause of action, however, does not fall under NJLAD. It is an independently cognizable state common law cause of action. Plaintiffs' claim is therefore not impacted by NJLAD's religious institution exemption. Moreover, Plaintiffs' only factual basis to grant summary judgment sounds in race discrimination, but, as Plaintiffs' brief explains, the negligent supervision claim is not predicated on discrimination. As such, the Defendants' motion for summary judgment as to Count 22 is denied.

Since this state law claim is the sole surviving claim, the Court does not have an independent basis of jurisdiction over what remains of this action. Under 28 U.S.C. § 1367(c), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Absent exceptional circumstances impacting judicial economy, convenience, and

fairness to litigants, supplemental jurisdiction over state law claims should be declined where the federal claims are no longer viable.  Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995).

The Court declines to exercise supplemental jurisdiction.  With the grant of summary judgment against the educational and race discrimination claims and the claims arising from Plaintiffs' enrollment in the school, the lawsuit is fundamentally altered.  The remaining negligent supervision claim turns on different facts and theories of liability, and the legal standard that applies to the claim differ from the standards that apply to any of the federal claims.  See Garges v. People's Light & Theatre Co., 529 F. App'x 156, 164 (3d Cir. 2013).  Moreover, no trial date has been set and no final or proposed pretrial orders have been submitted.  The Court finds no exceptional circumstances to justify retaining jurisdiction in this case where no federal questions remain.  Therefore, the Court will decline to exercise supplemental jurisdiction over the remaining negligence claim.

V.    CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and the remaining state law claim is **DISMISSED** for lack of jurisdiction.

/s/ *Madeline Cox Arleo*            .
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**